May it please the Court, Kyle Wackenheim, Assistant Federal Public Defender from the Western District of Oklahoma, on behalf of Appellant Terry Ray. Mr. Ray challenges the District Court's denial of his motions to suppress this case This began with an un-Mirandized interrogation of Mr. Ray, resulting in an admission that he possessed a blasting cap in his truck. He gave subsequent statements to law enforcement after his arrest, which we submit were coerced. And finally, federal law enforcement secured a search warrant we submit on material misrepresentations, two falsehoods, which invalidate the search warrant. And all the while, Mr. Ray suffered from significant mental health issues known to those, to local law enforcement at the time of his initial arrest, and the failure to accommodate these is one reason why the entire investigation was failed. Well, who knew of those mental problems? Deputy Short, who was the second officer called to the scene, more senior of the two deputies that arrived, Deputy King, who was the initial officer that pulled over Mr. Ray, called Deputy Short for assistance when Mr. Ray started making suicidal comments. And so the statements that you're objecting to were obtained by Deputy Short? Correct. Okay, and he knew about the mental problems? The testimony in the record is that Mr., excuse me, Deputy Short was aware, generally, that who Mr. Ray was. He recalled arresting him previously, but also that he overheard a conversation with other deputies in which Mr. Ray was known to have visited Red Rock. Red Rock is a facility that provides, among other things, mental health treatment. Well, and those among other things are kind of important because it also does drug treatment, addiction counseling, correct? That is what he testified to, and colloquially, when someone is referred to having gone to Red Rock, it means mental health issues. It's possible that he thought it may refer to other things, but I would also note that when he's, when Deputy Short eventually finds the blasting cap and is requesting assistance, he describes Mr. Ray as, I've got a crazy guy out here with some blasting caps. Well, he was, he was acting a little unusual, wasn't he? Absolutely. I mean, that's sort of a present representation of what he's seeing, not, here we go again, we know this guy's crazy. Well, I think it's fair to say that the possession of blasting caps in and of itself, and the manner in which Mr. Ray was conducting himself, buttresses. Well, he was crying and he was suicidal, right? Yes, he was. Yeah. That's what I mean. This is what Deputy Short saw. Correct. And that's why he was on the scene, and that's the information that he had. Now, that information did not make its way to federal law enforcement, Agent Taylor, who swore out the affidavit that was eventually used to secure the search warrant. But our position is that the statement of the blasting cap in the truck, the district court was correct in suppressing that statement because it was solicited in violation of Miranda. But we want to go a step further and suppress the actual physical evidence found in the duffel bag. Now, the district court disagreed and had two bases for you. Well, you'd have to show the statements were coerced, right? Correct. Okay. And so your position is that they're coerced because of knowledge that he had been previously at a facility that, among other things, treats mental illness. Correct. Along with other factors, those factors being Mr. Ray not being given Miranda to begin with, being handcuffed in a confined area, being asked questions from an armed, uniformed police officer standing feet away. And this is all on the video for the court to see. Well, he was handcuffed when he was arrested on the driving on a suspended license for the second time in a short period of time, correct? Correct. And he actually put him in the front passenger seat of the vehicle, right? Correct. Okay. And that, in your view, that is evidence of coercion? I think it's one of the pieces of evidence that's used in the totality of the circumstances to determine whether it is coerced. The other attack that we've had, that we've submitted, and this court is bound by a patentee in that line of cases. We think the Tenth Circuit got it correct before it was reversed by the Supreme Court. But we just wanted to preserve that issue that we think that case was erroneously decided. We're probably not going to overrule that case. Nor do you have the ability to. And I respect that. So our position is that that statement was coerced. And the unique feature of this case beyond the typical solicitation in violation of Miranda is Deputy Short's personal knowledge of Mr. Ray's mental health status and the suicidal comments that he was making. The District Court's second justification for the search would be an inventory search. And I think that presents an interesting legal issue that I'd like to submit to the court. We've briefed this. The District Court relied on a hypothetical, properly conducted inventory search. I want to stop you just to be clear. If we disagree with you that the statements are coerced, we never reach this issue, correct? Yes. Okay. So I would have to win on both of these. Okay. And turning to the second one that I also have to win. The hypothetical search in this case we submit actually occurred. We had testimony and there's body cam footage showing Deputy King, the initial arresting officer on the scene, beginning his inventory search. And he, if you review the video. This seemed a little odd. There was testimony in this case that the inventory search that they normally conduct is done on the roadside? That's correct. That was what was said. What happened to the towing the vehicle and bringing it someplace else like back to the police station or some car lot and then really going through it? That's the usual thing, isn't it? And that would be justified for officer safety of getting the vehicle off the road. But I think the testimony, which we have to rely on, and it was solicited by the District Court, are you telling me this is done on the side of the road? And yes, it is, to ensure that any valuables are not lost or damaged during the transport. So I think the inventory is completed before. Well, there's a search and then there's a search, I guess. When I think of inventory search, I think of a very thorough search off-site. Well, that was not testified to by the officer. The government asked us to do it. That's not what they would have done here. Once they completed whatever they did at the roadside, that's it. Is that your view? That's the testimony below. And this case is unique because Mr. Ray is not challenging that the inventory search was done in violation of the policies of the Custer County Sheriff's Office, but rather it was done in compliance with those policies and the evidence wasn't found. So relying on a hypothetical search when one has been done seems to be not the independent police investigation required. Well, they weren't done with the search, were they? I mean, you know, you say the search wasn't done and they didn't find it and therefore we can't look to a hypothetical inevitable discovery, but they were in the process of the search and would walk back and ask him questions. You know, I don't know that we can conclude they wouldn't have found the blasting cap. I'm asking you to find that conclusion. I think there is some factual support for that and that would be that, and this is found at the transcript pages 33 through 34 and also Deputy King's video beginning at 37 minutes into the video, he's searching the duffel bag with the specific intent to find this pipe, a meth pipe that was discussed as being in there. He has also his clipboard where he is doing his inventory search. Roughly 30 seconds later, he's told to stop and that's when Deputy Short learns there's a blasting cap. We need to stop. I mean, doesn't that sound like they weren't finished though? Doesn't that sound like they were in process and he tells him to stop because he had some new information that he wanted to run down? It's consistent with stopping, but what happens next? Deputy Short goes to the passenger side of the vehicle and conducts his own initial search to see where the blasting cap is. And he looks where he's been told to look, which is in the truck, and he does not find the blasting cap. So that's two times where law enforcement has gone into the truck and not found the blasting cap. But, I mean, you're asking us to assume that after they've been told a blasting cap is in the vehicle that they're just going to give up and say, OK, well, we didn't see it on our first or second pass, so we're done. And I just don't think that that's a fair assessment of what happened here. If I'm unpersuasive in demonstrating that the inventory search has been completed, then I see the court's point. Our argument here is that a court cannot rely on a hypothetical inventory search when one has been completed. We submit that the facts support that it has been completed. I don't think the district court properly chased down that line of argument. It quickly identified that the deputies didn't know what a blasting cap looked like, and certainly they didn't find it. And it was only after a third look, after additional statements in violation of Miranda were solicited, that the blasting cap was found and the entire search was put on hold and Deputy Short called other individuals. I'd like, if I could, in the few moments that I have, to turn to the third issue, which is the search warrant in this case. There's no dispute that there are two incorrect statements in Agent Taylor's search warrant affidavit. First statement is that Deputy, well, first statement is that Mr. Ray said during the stop that he has more evidence. Blasting caps at his house. And the second is Agent Taylor's own statement that during his interrogation days later that Mr. Ray admitted having blasting caps at his house. Both of those statements are clearly contradicted by the objective evidence in the form of the video and also admitted to be incorrect during the testimony of the suppression. Well, the district court sort of looked at this like a cat and mouse game, I think, when we got into the debate, I guess, with the defendant about the house. And he says, it's not my house. With respect to paragraph 10. I think that's the semantics. And I think if you watch the video, you can see there is back and forth. The point that I'd like to make is Agent Taylor didn't submit to the reviewing magistrate in my training and experience, this cat and mouse, this game of semantics leads me to believe that he possesses these. It was a flat statement. He admitted having the blasting caps at the subject residence, period. And submitted that information needs to go to the magistrate who could rely on Agent Taylor's training and experience. And in the end, I think the district court did. With respect to the first statement, the district court noted that Deputy Short, who heard that un-Mirandized, I've got more blasting caps, and then he interpreted that to mean he has blasting caps at his house. And the video evidence and his own testimony suggest that Deputy Short persisted in that misremembering from the very beginning. He's told it to Deputy King, who told it to Agent Taylor. He's on the phone with other people. And he sticks by that until two days before the hearing when he reviews the tapes. The point that I'd like to make today is when dealing with heightened privacy interests of someone's home, when dealing with an un-Mirandized statement from an individual you know to have mental health issues, to then distort what that person says, we submit rises the level of recklessness. And so that that statement needs to be excised. Well, part of the affidavit, didn't part of the affidavit include information that was obtained through the telephone call that the defendant made to his friend? That's pretty damning here. And that was justified. Your friend, go hide the stuff they're looking for at my house. Yeah, there you go. Heath Justice contacted local law enforcement about a recorded telephone call that Mr. Ray made in which he requested not only feed my pets, but there's something on the couch, can you please remove that? Something on the couch that they're looking, the police are looking for, right? It wasn't just something on my couch. We know also that law enforcement was concerned that Mr. Ray may possess a 410 shotgun. That may have been the item that was referred to. That's not clear from the affidavit. I'll also submit that the items to be searched did not include looking for firearms. The district court also relied on other statements about blowing up a tree stump in the front yard as suggesting he's got these blasting caps in the house. I think it's correct that the evidence supports that. At some point, Mr. Ray used a blasting cap on his tree stump, which is a legitimate purpose if you're able to possess these lawfully. But that in and of itself does not support having blasting caps in the house. We submit that probable cause, which is reviewed de novo, is insufficient when you excise those two statements. Thank you, Your Honor. Thank you. Thank you. May it please the court. Good morning. My name is Wilson McGarry. On behalf of the United States Appellee, I'm an assistant United States attorney in the Western District of Oklahoma. Before you, you have three questions to answer. And as the appellant conceded, I believe, the first question has been answered and this court should affirm based on precedent. But the underlying facts of this case come before you based on events on April 1st, 2017, when Mr. Ray was lawfully stopped by Custer County deputies. During the course of this stop, he was arrested based on his traffic violation and subsequently searched where deputies found what he suspected to be methamphetamine and a knife. Thereafter, he made some statements about a pipe being in the truck and then he began making suicidal comments which led to Deputy Schwartz's involvement in this case. Based on the statements that he made, Mr. Ray made, this led deputies to the blasting cap in the duffel bag. And during this heightened, I think, very critical situation, after learning of the blasting cap, there was perhaps miscommunication between Mr. Ray and Deputy Schwartz, government's position that Deputy Schwartz reasonably inferred that when Mr. Ray said that he had more blasting caps that these would be located at his residence, he passed that along. When was the defendant first Mirandized? The defendant was first Mirandized at his April 3rd interview with ATF agents. So no Miranda warning at the roadside? That's correct, Your Honor. And further to my point, the reason we're here is based on those statements at that traffic stop which were included in the affidavit and led to the interview by ATF brings us to the questions of the reasonableness, or not reasonableness, but the challenge to the affidavit by Mr. Ray. However, based on the lower court's ability to judge the credibility of the witnesses in this case and the lower court's conclusions regarding the evidence, the United States would move this court to affirm those decisions. How is the district court judging credibility again? He heard from Schwartz? Yes, Deputy Schwartz testified at the suppression hearing. Deputy King, who was the initial deputy at the scene that conducted the traffic stop, testified at the suppression hearing. And ATF agent Brendan Taylor testified. So we go off here and conclude that, gosh, well, it's actually not true what Schwartz said, but it was just negligent, reckless, maybe a little reckless. A mistake. Negligence at best. Under the circumstances, it's a completely reasonable inference to make when he says, I've got a whole bunch more of them. At that time, I believe the video would show that as soon as that statement is made, that he's got a blasting cap with Deputy Schwartz's knowledge that Deputy King at that time is in the process of looking for the pipe, having also begun the inventory search, that he is afraid for the safety of Deputy King. And at that point, it's clear from the video that Mr. Ray did not say at his house, but under the circumstances. It's a reasonable inference. So, yes, it's not, it wasn't a... But you double check, usually, don't you? Double check. You double check the video before you swear out an affidavit to obtain a warrant to search a house? In this case, that did not occur. Should have, though, right? Arguably, he could have, but he had no reason to question the veracity of the statements provided by Deputy King. At that moment, I think Agent Taylor was perfectly, acted within his, you know, bounds to rely on that statement from Deputy King. At that moment, it's another law enforcement agent. Is there any testimony that the officers generally rely on or generally go behind another officer's statement to them? So, if Schwartz makes the statement, he said he had more blasting caps at his house when he was sitting in my car, will they generally then go back to the camera footage to confirm that, or will they... Is there any testimony to that effect? I don't think there's any testimony to that effect, to my knowledge, but I don't, I believe that agents wouldn't do that in every case, otherwise they'd be bogged down in the heat of the moment having to obtain body camera footage from various deputies and sit there. I mean, the video's 45 minutes long, which is not a lengthy time for a stop at all, but perhaps in a situation where blasting caps are involved, going beyond that might slow the process. Are you aware of any case law that would require an officer to go behind someone else's statement to confirm it through the tape? No, Your Honor. Is the tape the best evidence? I believe the tape is the best evidence. In combination with the testimony from the individuals themselves to be able to explain what they were thinking at the time and explaining their reactions and why they did the things they did that are shown in the videos. If we disagree with you and we think that those statements about the blasting caps being at Mr. Ray's residence should be excised, did they have probable cause to search the house? Yes, Your Honor. The affidavit included statements from Brendan Taylor about his follow-up investigation from statements made by Mr. Ray when he stated that he had blown up a tree stump with the blasting caps in his front yard. Agent Taylor followed up by contacting Mr. McCoy, Mr. Ray's son, and Heath Justice. It might have been vice versa, but there was some communication between them. Ultimately, they met him at the residence where Agent Taylor was able to personally observe the tree stump that was exploded or blown up. Then, during the April 3rd interview that was about the blasting caps, within a day, Mr. Ray had made a call to Mr. Justice saying something to the effect of feed my cat and get the item on the couch that the police are looking for. So, it's clear from the record and the events that Mr. Ray is completely aware that the ATF is looking for the blasting caps at that moment. So, those combined would provide probable cause in the affidavit even if the court were to excise paragraphs 7 and 10 regarding the false statement provided or the mistaken statement. Let me ask you about the inventory search. Is it a fair reading of the record that the inventory search basically was not complete at the time he started talking about the blasting cap being in the car? That's correct. A review of the video, which provides very good evidence of the occurrence, shows throughout the video you can see he's filling out a form, he's checking the VIN, but at the same time he also has in his mind the statement that there's a methamphetamine pipe in the truck. So, as the events unfold, he's both looking for the pipe specifically but also stopping to complete the inventory search and based on the information of the blasting cap comes out, the video is fairly clear that they haven't completed the inventory search at that time or the time he's looking in the duffel bag initially, arguably he's looking for the pipe and the video is only the briefest of look in there anyways and he's focused on looking for a pipe and not necessarily completing the inventory search. So, I believe the record reflects that the inventory search was not complete at that moment and however this court doesn't even need to reach or analyze that those changes of events or whether there was an inventory, whether we should rely on a hypothetical inventory search based on United States v. Patain because even though those statements that Mr. Ray made were un-Mirandized, they were made voluntarily and the evidence, the physical evidence, the blasting cap is admissible at that point and the court correctly determined not to suppress it. Looking at whether those statements would come in under Patain we have to consider whether they were coerced, correct? Here we have someone, there's one officer who knows that Mr. Ray spent time in a facility that provides services for people with mental illnesses and Mr. Ray is crying and threatening to kill himself so he's obviously quite distressed, he's handcuffed, they've already told him he's going back to prison and you have two officers, both of them armed, I mean isn't that a coerced statement at that point? No Miranda warning? No, Your Honor. At that point he's simply in custody there's no evidence and the court found no evidence that there were threats made there was, for instance, Deputy Short the record's clear that he didn't know the extent of Mr. Ray's mental illness or why he had gone to Red Rock which the record shows that treats a wide range of ailments and there's no evidence that he used any of his limited knowledge of his treatment at Red Rock in order to coerce him or threaten him and there was no physical violence or abuse or punishment inflicted upon him. The video shows us this but was the defendant questioned? Was there an interrogation? I mean there's no Miranda need unless you're asking questions. Yes, Your Honor. I believe the record reflects that Deputy Short and Deputy King asked, do you have anything else in the car? So to the extent those would elicit an incriminating statement and he was in custody yes, there was an interrogation however, looking at those statements they were made voluntarily there was no police coercion and this court should affirm Judge McHugh has just painted the picture of the situation we had there this guy was falling apart in front of them yes, I mean he was visibly distraught and clearly very upset but those deputies didn't use that in order to to coerce him you know, typically coercion well they asked him questions and they didn't Mirandize him yes, but that doesn't those didn't rise to the level of coercion there were only two deputies you can ask nice questions or not nice questions where's the line here? well, I think the line is threatening questions I don't believe they were threatening him they weren't physically abusing him when they spoke to him, they spoke to him I believe the record shows that one-on-one really it looked like they were just trying to do their job and ensure the safety of the situation and to suss out the probable cause or reasonable suspicion that they might have that there's a pipe in the truck based on a review of their conduct at that situation there was nothing threatening violent or coercive in nature in their interaction while they did ask him the questions about what else is in the car those questions and their interactions with them did not rise to the level of coercion or threats thank you thank you both for your arguments this morning the case is submitted